PER CURIAM.
Richard Knight was convicted of two counts of first-degree murder for the deaths of Odessia Stephens and four-year-old Hanessia Mullings, which occurred on June 28, 2000. Knight appeals his first-degree murder convictions and sentence of death. We have mandatory jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm Knight’s convictions and sentences of death.
FACTS AND PROCEDURAL HISTORY
The Guilt Phase
The evidence presented at trial established that Knight lived in an apartment with his cousin, Hans Mullings, Mullings’ girlfriend, Odessia Stephens, and their daughter, Hanessia Mullings. Mullings and Odessia had asked Knight to move out numerous times.
On the night of the murder, June 27, 2000, Mullings was at work. At approximately 9-p.m., Mullings spoke to Odessia, who said she was going to bed, and then Mullings left his office to run errands. Knight was at the apartment with Odessia and Hanessia.
Around midnight, an upstairs neighbor heard multiple thumping sounds on the apartment walls and two female voices, one of which was a child crying. The neighbor called 911 at 12:21 a.m. on June 28, 2000. The cries continued after the police arrived.
Officer Vincent Sachs was the first to respond. He arrived at 12:29 a.m. and noted that the lights were on in the master bedroom and hall area, and that a second *882 bedroom’s window was slightly ajar. After knocking and receiving no response, he walked around the unit and noticed that the lights had been turned off and that the previously ajar window was now completely open and blinds were hanging out of it. Sachs shined his flashlight through the dining room window. He saw blood in the dining room and master bedroom. Further, he noticed Hanessia curled in the fetal position against the closet door. Once inside, he observed Odessia’s body in the living room. All of the doors were locked and there had been no ransacking of the apartment.
Officer Natalie Mocny arrived next and walked around the unit.[1] She also saw the open window and noticed Knight on the other side of some hedges approximately 100 yards from the building. She beckoned him over for questioning. Officer Sachs joined Mocny. According to the officers, Knight had a scratch on his chest, a scrape on his shoulder, and fresh cuts on his hands. Although it was not raining, Knight was visibly wet. Knight was wearing dress clothes and shoes, yet told Moc-ny that he had been jogging, and that he lived in the apartment, but did not have a key to get inside. There was blood on the shirt he was wearing and on a ten-dollar bill in his possession.
The crime scene investigation recovered two wet towels in Knight’s bedroom, a shirt, boxers, and a pair of jean shorts under the sink in the bathroom near Knight’s bedroom, all of which belonged to Knight and had numerous bloodstains. Two knife blades were also recovered, one from under the mattress in the master bedroom, and another from under Odes-sia’s body.
Odessia’s blood was found in the master bedroom between the bed and the wall, on the master bedroom blinds, on the living room carpet, on the knives’ handles and blades, and on the knife holder in the kitchen. Odessia’s blood was also discovered on Knight’s boxers, shirt, jean shorts, the clothing Knight had been wearing when arrested, and his hand. Fingernail scrapings taken from Odessia contained Knight’s DNA profile.
Hanessia’s blood was found on one of the knives, on Knight’s boxers, jean shorts, and on the shower curtain. The shower curtain also contained the blood of Knight’s acquaintance, Victoria Martino.
Dr. Lance Davis, the medical examiner, observed the bodies at the scene. Odessia was found on the living room floor near the entrance with several broken knife pieces around her. She had twenty-one stab wounds: fourteen in the neck, one on the chin, and the rest on her back and chest. Additionally, she had twenty-four puncture or scratch wounds and bruising and ligature marks on her neck. The bruises appeared to have been made by a belt or similar object. She also had defensive wounds on both hands and wounds on her leg, chest, back and neck. Several of the knife wounds were fatal but none would have resulted in an instantaneous death. She had bruises from being punched on her scalp and mouth. Davis opined that Knight began his attack in the bedroom with Odessia fleeing to the living room. He estimated that Odessia was conscious for ten to fifteen minutes after the attack.
Davis discovered Hanessia on the floor next to the closet door. There were broken knife pieces around her. She had a total of four stab wounds in her upper chest and neck. Her hand had one additional stab wound and numerous defensive *883 wounds. Hanessia’s arms and upper body had numerous bruises and scratches. There were bruises on her neck that were consistent with manual strangulation and bruises on her arms consistent with being grabbed.
Stephen Whitsett and Knight were housed together from June 29, 2000, to July 22, 2000, at the Broward County Jail. Knight confessed to Whitsett about the murders as follows: The night of the murders Knight and Odessia argued. She told him that she did not want to support him and that he would have to move. He asked for some more time because he had just gotten a job, but Odessia refused and told him to leave in the morning. Knight left the house to go for a walk and he became increasingly angry. He returned that night, confronted Odessia in her room, and they argued.
Knight went to the kitchen and got a knife. When he went back to the master bedroom, Odessia was on one side of the bed and Hanessia was on the other. He began by stabbing Odessia multiple times. Odessia eventually stopped defending herself and balled up into a fetal position. Knight then turned to four-year-old Hanessia. The knife broke while he was stabbing Hanessia, so he returned to the kitchen for another. Upon returning, Knight saw Hanessia had crawled to the closet door and was drowning in her own blood.
Again, Knight returned to the kitchen and accidentally cut his hand on one of the broken knives that he had used to stab Odessia and Hanessia. He grabbed another knife. Odessia had crawled from the master bedroom to the living room and was lying in her own blood. He rolled her over and continued his attack. Odessia’s blood covered Knight’s hands, so he wiped them on the carpet.
Knight further confessed that, after he finished with Odessia, he went to the bathroom, took off the blood soaked shorts and T-shirt, and tossed them under the sink. He showered and put on blue polo pants. He wiped down the knives in the living room. At that time, Knight heard a knock on the door and saw the police outside through the peep hole. He ran to his room and out the window. In an attempt to deflect suspicion away from himself, Knight returned to his bedroom window where he saw a female police officer.
Knight was charged by indictment on August 15, 2001, for the murders of Odes-sia Stephens and Hanessia Mullings. The jury found Knight guilty of both counts of first-degree murder.
The Penalty Phase
At the penalty phase, Knight called six witnesses, several of whom testified about his childhood and upbringing in Jamaica. His teacher, Joscelyn Walker, told the jury that Knight was a respectful and loving boy raised in a very respected family. He said that Knight did have a temper when provoked and would become extremely frustrated at times. Walker had to restrain him from time to time when Knight wanted to fight another child. Knight’s high school art teacher, Joscelyn Gopie, described Knight as a pleasant, eager boy who was quite talented at art. Gopie explained that Knight was adopted as a toddler by his family. Knight left high school before he graduated.
Barbara Weatherly is the mother of Knight’s former fiancée. She described him as a decent, honorable guy who respected her rules regarding her daughter. He always helped her younger children with their drawing. He was a quiet and peaceful person who spent a lot of time alone. One night at her house he got sick; his eyes rolled back in his head and he frothed at the mouth before passing out. *884 They took him to the hospital where the doctor said that he needed to see a psychiatrist. She last saw him in 1998 when he left to go to the United States.
A former boss and coworker of Knight’s, Stanley Davis, also testified. Davis explained that Knight had been adopted into a well respected family and had a close loving relationship with his family members. Knight took over many of his father’s duties when his father lost a leg. Knight worked with him at a construction company and was a good worker. On one occasion Knight fell and blacked out, after which he had difficulty concentrating and became timid.
Valerie River, the defense investigator, and Knight’s attorney journeyed to Jamaica to interview Knight’s family and friends. Knight was abandoned by his mother and the Knight family found him at a hospital and took him home. He was a good brother and son. Knight’s close friends and family said that he was a nice and good person. Knight’s sister-in-law used to have Knight babysit her children but eventually stopped because he was careless around the house. Knight blacked out on one occasion. Knight’s former boss Sted-man Stevenson said he was a hard worker and a quick learner. He took Knight to Florida, and Knight decided to stay.
Knight also presented expert Dr. Jon Kotler who practices nuclear medicine and specializes in PET scans of the brain. He explained that Knight’s physical symptoms indicated that he might have a brain injury. The MRI done on him was normal. Dr. Kotler did a PET scan which he interpreted as showing asymmetrical brain activity indicating possible pathology of the brain, perhaps a seizure disorder. He could not say exactly what the pathology might be or how it might manifest itself in Knight’s behavior. Dr. Sfakianakis, another nuclear medicine doctor, read the PET results as showing only a mild difference between the brain hemispheres which was within the normal fluctuations of the brain.
Following the presentation of penalty-phase testimony, the jury unanimously recommended the death penalty for both murders.
The Spencer[2] Hearing
The trial court subsequently conducted a Spencer hearing on August 18, 2006. At the hearing, the defense submitted the report and deposition of neuropsychologist Dr. Mittenberg who examined Knight but refused to testify at trial. The State submitted the report and deposition of Dr. Lopickalo, another neuropsychologist. Mullings and Eunice Belan also gave victim impact statements.
The Sentencing Order
Subsequent to the Spencer hearing, the trial court followed the jury’s recommendation and sentenced Knight to death. In pronouncing Knight’s sentence, the trial court determined that the State had proven beyond a reasonable doubt two statutory aggravating circumstances for the murder of Odessia Stephens: (1) a previous conviction of another violent capital felony, and (2) that the murder was especially heinous, atrocious, or cruel (HAC). The court also found three statutory aggravating circumstances for the murder of Hanessia Mullings: (1) a previous conviction of another violent capital felony, (2) HAC, and (3) the victim was under twelve years of age. The court found no statutory mitigating circumstances but found eight nonstatutory mitigators, which are set forth in our proportionality discussion.
*885 On direct appeal, Knight raises five claims.[3] We conclude that each issue is without merit. We also find the evidence sufficient to support Knight’s convictions, and that the death sentences are proportionate.
ANALYSIS
Hans Mullings’ Testimony
Knight first claims the trial court erred in denying his motion for mistrial following the State’s redirect examination of Hans Mullings, during which Mullings stated that Knight had a “violent background.” Specifically, Knight contends that Mull-ings’ testimony had a negative impact on his character and resulted in undue prejudice. While we agree with Knight that Mullings’ statement was improper, we disagree that the trial court erred by not granting a mistrial under these circumstances.
The facts underlying this claim are as follows. During redirect examination by the State, Mullings testified that when he arrived at his residence and saw the police, “I was just assuming that, truthfully, probably Odessia and Richard got into an argument or something because I know Richard’s violent background.” The defense objected to this testimony and moved for a mistrial. The trial court sustained defense counsel’s objection and instructed the jury to disregard the comment.
A trial court’s denial of a motion for mistrial is reviewed by an abuse of discretion standard. Cole v. State, 701 So.2d 845, 852 (Fla.1997). The granting of a motion for mistrial is not based on whether the error is “prejudicial.” Rather, the standard requires that a mistrial be granted only “when an error is so prejudicial as to vitiate the entire trial,” England v. State, 940 So.2d 389, 401-02 (Fla.2006), such that a mistrial is “necessary to ensure that the defendant receives a fair trial.” McGirth v. State, 48 So.3d 777, 790 (Fla. 2010), cert. denied, — U.S. —, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011). “It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity.” England, 940 So.2d at 402 (quoting Thomas v. State, 748 So.2d 970, 980 (Fla.1999)). Therefore, “[i]n order for [Mullings’ statement] to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.” Salazar v. State, 991 So.2d 364, 372 (Fla.2008) (quoting Spencer v. State, 645 So.2d 377, 383 (Fla. 1994)).
It has been established that the State cannot introduce evidence attacking the character of the accused unless the accused first puts his good character in issue. See Wadsworth v. State, 201 So.2d 836 (Fla. 4th DCA 1967), quashed on other *886 grounds, 210 So.2d 4 (Fla.1968), § 90.404(l)(a), Fla. Stat. (2006).
In the instant case, Mullings, the victims’ surviving boyfriend and father and the defendant’s cousin, testified that he rushed back to the apartment because he knew Knight had a violent background. However, as noted above, the defense objected, the objection was sustained, and the jury was instructed to disregard the remark. The statement was not so prejudicial as to prevent Knight from receiving a fair trial. See, e.g., Roman v. State, 475 So.2d 1228, 1234 (Fla.1985) (concluding that the trial court did not err in denying motion for mistrial when prosecutor’s question implied that the defendant had a prior criminal record because although the question was improper, there was other overwhelming evidence against the defendant). Accordingly, we conclude the trial court did not abuse its discretion in denying Knight’s motion for mistrial.
Allegation That Jurors Saw Knight in Shackles
Next, Knight claims that the trial court improperly denied his motion for mistrial for being shackled in the presence of the jury during the guilt phase. On the final day of jury selection and after the jury had been impaneled, two custody deputies escorted Knight past the jury room. At the same time, the bailiff briefly opened the jury room door. Knight was wearing handcuffs and shackles. Knight filed a motion for mistrial and a motion to disqualify the jury. During an evidentiary hearing on the motions, the deputies reenacted the scenario. The trial court found that no juror could have seen Knight and denied the motion for mistrial.
This Court reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard. England v. State, 940 So.2d 389, 402 (Fla.2006). If reasonable people could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and therefore is not an abuse of discretion. Bryant v. State, 901 So.2d 810, 817 (Fla. 2005) (citing Canakaris v. Canakaris, 382 So.2d 1197, 1203 (1980)). A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. Seibert v. State, 923 So.2d 460, 471-72 (Fla.2006).
First, it is well accepted that shackling a defendant during a criminal trial is “inherently prejudicial.” Deck v. Missouri, 544 U.S. 622, 635, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) (quoting Holbrook v. Flynn, 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)); see also Bryant v. State, 785 So.2d 422, 429 (Fla.2001) (quoting Bello v. State, 547 So.2d 914, 918 (Fla.1989)). Visible shackling interferes with the accused’s presumption of innocence and the fairness of the fact-finding process. Deck, 544 U.S. at 630, 125 S.Ct. 2007; Bryant, 785 So.2d at 428; see also Diaz v. State, 513 So.2d 1045, 1047 (Fla.1987). For that reason, visible shackles must only be used when “justified by an essential state interest” specific to the defendant on trial. Deck, 544 U.S. at 624, 125 S.Ct. 2007; see Bello, 547 So.2d at 918.
Here, Knight was not forced to stand trial while wearing shackles, but was merely shackled during transport when, according to his allegation, he was inadvertently viewed by several jurors. The record indicates that it is unlikely any juror saw Knight in shackles. However, even if we assumed Knight’s allegation to be true,
[w]e have long held that a juror’s or prospective juror’s brief, inadvertent view of a defendant in shackles is not so prejudicial as to warrant a mistrial. See, e.g., Singleton v. State, 783 So.2d *887 970, 976 (Fla.2001) (explaining that the jurors’ brief glances of the defendant while he was being transported in prison garb and shackles, standing alone, were not so prejudicial as to require a mistrial); Stewart v. State, 549 So.2d 171, 174 (Fla.1989) (finding that a new trial was not warranted where the defendant’s shackles were ruled unobtrusive and necessary by the trial court and were only barely visible beneath the table); Heiney v. State, 447 So.2d 210, 214 (Fla. 1984) (holding that the jurors’ possible inadvertent and brief sight of the defendant being transported into the courtroom in chains did not justify a mistrial); Neary v. State, 384 So.2d 881, 885 (Fla. 1980) (concluding that the jurors’ inadvertent sight of the defendant being brought into the courtroom in handcuffs was not so prejudicial as to require a mistrial). Thus, the mere fact that a prospective juror saw the shackled ankles of a person whom he believed to be [the defendant] underneath a chalkboard set up in the hallway outside the courtroom is not sufficient, standing alone, to warrant a mistrial or dismissal of the venire.
Hernandez v. State, 4 So.3d 642, 658 (Fla.), cert. denied, — U.S.—, 130 S.Ct. 160, 175 L.Ed.2d 101 (2009).
Applying that reasoning to the facts of this case, we conclude that even if there was an inadvertent sighting of Knight in shackles, it was not so prejudicial as to warrant a mistrial. Thus, the court’s decision to deny Knight’s motion for mistrial was not an abuse of discretion.
Discovery Violations
Knight also challenges the trial court’s ruling that no discovery violation occurred and alleges the trial court erred in denying Knight’s motion for mistrial based on the State’s experts’ testimony regarding DNA evidence. Knight argues that the State provided defense counsel with what appeared to be a complete DNA comparison, but then ordered further DNA comparisons without any notice to the defense. Based on the State’s discovery produced prior to trial, defense counsel relied on serologist Kevin Noppinger’s DNA analysis that Knight’s jean shorts and boxers, recovered from the apartment bathroom, contained Odessia and Hanessia’s DNA, and excluded the DNA of Knight.
At trial, however, the prosecutor presented testimony from Dr. Kevin McEl-fresh of Bode Technology Group establishing that Knight’s DNA could not be excluded from the jean shorts and boxers. Because the defense was under the impression that the jean shorts and boxers would exclude Knight, Knight argues that the State “ambushed” the defense at trial by failing to disclose the additional DNA analysis that failed to exclude Knight’s DNA from the jean shorts and boxers. Knight asserts the State violated discovery rules and that the trial court erred by failing to conduct a Richardson[4] hearing on the alleged violation. This claim is without merit.
As articulated by this Court in Sinclair v. State, 657 So.2d 1138, 1140 (Fla.1995):
[W]hen the State violates a discovery rule, the trial court has discretion to determine whether the violation resulted in harm or prejudice to the defendant, but this discretion can be properly exercised only after adequate inquiry into all the surrounding circumstances. State v. Hall, 509 So.2d 1093 (Fla.1987). In making such an inquiry, the trial judge must first determine whether a discov *888 ery violation occurred. If a violation is found, the court must assess whether the State’s discovery violation was inadvertent or willful, whether the violation was trivial or substantial, and most importantly, what affect it had on the defendant’s ability to prepare for trial.
See also Taylor v. State, 62 So.3d 1101, 1112 (Fla.2011). Under this precedent, it is only after the trial court finds a discovery violation that it must make an inquiry into whether the State’s discovery violation was inadvertent or willful, whether the violation was trivial or substantial, and most importantly, what affect it had on the defendant’s ability to prepare for trial. See Richardson v. State, 246 So.2d 771, 775 (Fla.1971) (requiring court to determine if violation of rule relating to exchange of witness lists was inadvertent or willful, whether violation was trivial or substantial, and what effect, if any, it had upon ability of other party to properly prepare for trial).
In this case, contrary to Knight’s argument, the trial court determined that the State provided Knight with all the evidence presented at trial and that no discovery violation occurred, which is supported by the record. The record demonstrates that the questioned evidence was produced and the trial court found no discovery violation occurred after two inquiries. In fact, the trial court found that the defense was actually in receipt of all evidence, but complained of having the evidence interpreted differently by two experts and having relied on the information from the first expert. See State v. Evans, 770 So.2d 1174, 1177-78 (Fla.2000) (“When testimonial discrepancies appear, the witness’ trial and deposition testimony can be laid side-by-side for the jury to consider. This would serve to discredit the witness and should be favorable to the defense. Therefore, unlike failure to name a witness, changed testimony does not rise to the level of a discovery violation and will not support a motion for a Richardson inquiry.” (quoting Bush v. State, 461 So.2d 936, 938 (Fla.1984))). Therefore, because the trial court found that no discovery violation occurred, and that finding is supported by the record, we conclude that no Richardson hearing was required in this case.
Based on a review of the record, we hold that the trial court did not err in finding that no discovery violation occurred. Thus, a Richardson hearing was not required and the trial court properly denied Knight’s motion for mistrial. Furthermore, although a Richardson hearing was not required, the trial court nevertheless complied with this Court’s precedent in holding such a hearing.
Knight’s Motion to Seat a New Jury
Knight contends Mullings’ testimony during the guilt phase proceedings that Knight had a “violent background” required the trial court to seat a new jury for purposes of the penalty phase of the trial. Knight argues that Mullings’ testimony was so prejudicial that this Court should reverse and remand for a new penalty phase proceeding. Knight’s argument is without merit.
A trial court’s decision on whether to dismiss a venire is reviewed for an abuse of discretion. See Richardson v. State, 706 So.2d 1349, 1357 (Fla.1998); Valderrama v. State, 816 So.2d 1143, 1144 (Fla. 4th DCA 2002); Bauta v. State, 698 So.2d 860, 861-62 (Fla. 3d DCA 1997).
We have previously considered this issue as a guilt-phase claim and concluded that the trial court did not abuse its discretion in failing to grant a mistrial after Mullings made this statement. We likewise conclude that the trial court did not abuse its discretion in refusing to dis *889 miss the venire prior to the penalty phase based on the impact of this same statement. We have held that defendants subject to the death penalty are not entitled to separate guilt and penalty phase juries. See Melton v. State, 638 So.2d 927, 929 (Fla.1994); Riley v. State, 366 So.2d 19, 21 (Fla.1978) (concluding that there is “no compulsion in law or logic” to bifurcate juries in capital case trials). Here, the jury is presumed to have followed the trial judge’s admonition to disregard Mullings’ testimony during the guilt phase. Accordingly, there is no basis that would disqualify this jury from rendering a penalty recommendation. Accordingly, the trial court did not err, and we deny relief on this claim.
Florida’s Death Sentence Statute
Knight’s final claim challenges the constitutionality of Florida’s death sentencing scheme as set forth in section 921.141, Florida Statutes (2000). This argument is without merit. We have repeatedly rejected requests to revisit this issue. See Abdool v. State, 53 So.3d 208, 228 (Fla.2010) (“This Court has also rejected [the] argument that this Court should revisit its opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and find Florida’s sentencing scheme unconstitutional.”) (citing Guardado v. State, 965 So.2d 108, 118 (Fla.2007)), petition for cert. filed, No. 10-10531 (U.S. Apr. 25, 2011).
Sufficiency of the Evidence
Additionally, we must review the record for competent, substantial evidence to sustain Knight’s convictions for the murders of Odessia and Hanessia. See Miller v. State, 42 So.3d 204, 227 (Fla. 2010). A review of the record shows there is sufficient evidence to support the murder convictions.
As outlined above, the evidence presented at trial showed that Odessia and Hanessia died after being stabbed numerous times and strangled. There were three knives used in the attacks, all of them broken. There were a combined twenty-six stab wounds between the victims, plus additional puncture and scratch wounds. Hanessia had bruises consistent with Knight having repositioned his hands to strangle her, and Odessia had ligature marks on her neck that appeared to have been made by a belt or similar object. Odessia had bruises consistent with Knight having struck her on her head and punched her in the mouth. Both victims’ blood was found on Knight’s clothing. There was evidence of a struggle and that Knight had pursued Odessia to continue his attack on her. Both victims showed evidence of defense. Neither victim died instantly. Knight was found at the crime scene wet, although it was not raining, and claiming to have been jogging despite the fact he was wearing dress shoes. Further, Knight confessed to a fellow inmate while he was in jail awaiting trial. Accordingly, the record demonstrates that there is competent, substantial evidence to sustain Knight’s convictions for the first-degree murders of Odessia and Hanessia.
Proportionality
Finally, “[t]his Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant.” Bolin v. State, 869 So.2d 1196, 1204 (Fla.2004). Proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.” Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). Instead, the Court considers the totality of the circumstances to determine if death is warranted in comparison to other cases where the death sentence has been upheld. *890 Davis v. State, 859 So.2d 465, 480 (Fla. 2003). In addition, the heinous, atrocious, or cruel aggravator is one of the “most serious aggravators set out in the statutory sentencing scheme.” Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
The trial court found two statutory aggravating circumstances for the murder of Odessia Stephens: (1) a previous conviction of another violent capital felony, and (2) HAC. The court also found three statutory aggravating circumstances for the murder of Hanessia Mullings: (1) a previous conviction of another violent capital felony, (2) HAC, and (3) the victim was under twelve years of age. The aggrava-tors in this case were weighed against eight nonstatutory mitigators: (1) Knight had a good upbringing (slight weight), (2) Knight loves his family (moderate weight), (3) Knight went to high school and excelled in art (little weight), (4) Knight was admired by the children in his neighborhood as a youth and was well regarded by the adults (little weight), (5) Knight was a valuable employee in Jamaica (little weight), (6) Knight had part-time employment at the time of the crime (little weight), (7) Knight behaved well in court (little weight), and (8) Knight is capable of forming loving relationships (moderate weight).
Based on the evidence set forth earlier, the aggravators the trial court found, and the totality of the circumstances, Knight’s death sentences are proportionate compared to other death sentences this Court has upheld. See, e.g., Aguirre-Jarquin v. State, 9 So.3d 593, 610 (Fla.2009) (finding the death sentence proportionate in a double murder where three aggravators were found for one murder, five for the other, including prior capital felony, commission during a burglary, and HAC for both and eight mitigating circumstances were found, three statutory); Smithers v. State, 826 So.2d 916, 931 (Fla.2002) (finding the death sentence proportionate in a double murder where three aggravators were found for one murder and two for the other, including HAC and prior violent felony for both, and two statutory and seven nonstatutory mitigating factors were found); Francis v. State, 808 So.2d 110 (Fla.2001) (finding the death sentence proportionate in the double stabbing murders of elderly sisters where the trial court found four aggravators for each murder, including HAC, the victims vulnerability due to age, prior violent felony based on the contemporaneous murder, that the murders were committed during the course of a robbery, two statutory mitigators, and six nonstatutory miti-gators); Morton v. State, 789 So.2d 324 (Fla.2001) (finding the death sentence proportionate in a double murder by gunshot and stabbing where trial court found three aggravators with respect to one murder and five with respect to the other, including prior violent felony based on the contemporaneous murder and cold, calculated and premeditated for both and two statutory mitigators and five nonstatutory miti-gators).
CONCLUSION
In accordance with our analysis above, we affirm Knight’s convictions for first-degree murder and sentences of death.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. Officer Amy Allen also testified that she had climbed through the open window to open the apartment door and observed a deceased black female.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Knight asserts the following: (1) the trial court abused its discretion by denying Knight’s motion for mistrial based on Hans Mullings' comment that he knew Knight to have a violent background; (2) the trial court abused its discretion in denying Knight’s motion for mistrial based on the allegation that jurors saw him wearing shackles; (3) the trial court erred in ruling that no discovery violation occurred and in denying Knight's motion for mistrial based on the State’s expert’s testimony regarding DNA evidence; (4) the trial court erred in denying Knight's motion to seat a new jury based on Mullings’ testimony; and (5) the Florida death sentencing statute violates the Sixth Amendment and ignores Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. Richardson v. State, 246 So.2d 771 (Fla. 1971).