# Supreme Court of Florida

_____

No. SC2026-0718

_____

**RICHARD KNIGHT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

May 15, 2026

PER CURIAM.

Richard Knight is a prisoner under two sentences of death, for whom a death warrant has been signed and an execution date set for May 21, 2026.  He appeals the circuit court's order summarily denying his successive motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851 and requests a stay of execution.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.; *see also State v. Fourth Dist. Ct. of App.*, 697 So. 2d 70, 71 (Fla. 1997) (holding "that in addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types

of collateral proceedings in death penalty cases"). As we explain below, we affirm the summary denial of postconviction relief. We also deny Knight's request for a stay of execution.

## I. FACTS AND PROCEDURAL BACKGROUND

Knight was convicted of the first-degree murders of Odessia Stephens and her four-year-old daughter, Hanessia Mullings. *See Knight v. State*, 76 So. 3d 879, 881 (Fla. 2011). This Court previously set forth the following facts:

> The evidence presented at trial established that Knight lived in an apartment with his cousin, Hans Mullings, Mullings' girlfriend, Odessia Stephens, and their daughter, Hanessia Mullings. Mullings and Odessia had asked Knight to move out numerous times.
> On the night of the murder, June 27, 2000, Mullings was at work. At approximately 9 p.m., Mullings spoke to Odessia, who said she was going to bed, and then Mullings left his office to run errands. Knight was at the apartment with Odessia and Hanessia.
> Around midnight, an upstairs neighbor heard multiple thumping sounds on the apartment walls and two female voices, one of which was a child crying. The neighbor called 911 at 12:21 a.m. on June 28, 2000. The cries continued after the police arrived.
> Officer Vincent Sachs was the first to respond. He arrived at 12:29 a.m. and noted that the lights were on in the master bedroom and hall area, and that a second bedroom's window was slightly ajar. After knocking and receiving no response, he walked around the unit and noticed that the lights had been turned off and that the previously ajar window was now completely open and blinds were hanging out of it. Sachs shined his flashlight

through the dining room window.  He saw blood in the dining room and master bedroom.  Further, he noticed Hanessia curled in the fetal position against the closet door.  Once inside, he observed Odessia's body in the living room.  All of the doors were locked and there had been no ransacking of the apartment.

Officer Natalie Mocny arrived next and walked around the unit.  She also saw the open window and noticed Knight on the other side of some hedges approximately 100 yards from the building.  She beckoned him over for questioning.  Officer Sachs joined Mocny.  According to the officers, Knight had a scratch on his chest, a scrape on his shoulder, and fresh cuts on his hands.  Although it was not raining, Knight was visibly wet.  Knight was wearing dress clothes and shoes, yet told Mocny that he had been jogging, and that he lived in the apartment, but did not have a key to get inside.  There was blood on the shirt he was wearing and on a ten-dollar bill in his possession.

The crime scene investigation recovered two wet towels in Knight's bedroom, a shirt, boxers, and a pair of jean shorts under the sink in the bathroom near Knight's bedroom, all of which belonged to Knight and had numerous bloodstains.  Two knife blades were also recovered, one from under the mattress in the master bedroom, and another from under Odessia's body.

Odessia's blood was found in the master bedroom between the bed and the wall, on the master bedroom blinds, on the living room carpet, on the knives' handles and blades, and on the knife holder in the kitchen.  Odessia's blood was also discovered on Knight's boxers, shirt, jean shorts, the clothing Knight had been wearing when arrested, and his hand.  Fingernail scrapings taken from Odessia contained Knight's DNA profile.

Hanessia's blood was found on one of the knives, on Knight's boxers, jean shorts, and on the shower curtain.  The shower curtain also contained the blood of Knight's acquaintance, [V.M.]

Dr. Lance Davis, the medical examiner, observed the bodies at the scene. Odessia was found on the living room floor near the entrance with several broken knife pieces around her. She had twenty-one stab wounds: fourteen in the neck, one on the chin, and the rest on her back and chest. Additionally, she had twenty-four puncture or scratch wounds and bruising and ligature marks on her neck. The bruises appeared to have been made by a belt or similar object. She also had defensive wounds on both hands and wounds on her leg, chest, back and neck. Several of the knife wounds were fatal but none would have resulted in an instantaneous death. She had bruises from being punched on her scalp and mouth. Davis opined that Knight began his attack in the bedroom with Odessia fleeing to the living room. He estimated that Odessia was conscious for ten to fifteen minutes after the attack.

Davis discovered Hanessia on the floor next to the closet door. There were broken knife pieces around her. She had a total of four stab wounds in her upper chest and neck. Her hand had one additional stab wound and numerous defensive wounds. Hanessia's arms and upper body had numerous bruises and scratches. There were bruises on her neck that were consistent with manual strangulation and bruises on her arms consistent with being grabbed.

Stephen Whitsett and Knight were housed together from June 29, 2000, to July 22, 2000, at the Broward County Jail. Knight confessed to Whitsett about the murders as follows: The night of the murders Knight and Odessia argued. She told him that she did not want to support him and that he would have to move. He asked for some more time because he had just gotten a job, but Odessia refused and told him to leave in the morning. Knight left the house to go for a walk and he became increasingly angry. He returned that night, confronted Odessia in her room, and they argued.

Knight went to the kitchen and got a knife. When he went back to the master bedroom, Odessia was on one

side of the bed and Hanessia was on the other. He began by stabbing Odessia multiple times. Odessia eventually stopped defending herself and balled up into a fetal position. Knight then turned to four-year-old Hanessia. The knife broke while he was stabbing Hanessia, so he returned to the kitchen for another. Upon returning, Knight saw Hanessia had crawled to the closet door and was drowning in her own blood.

Again, Knight returned to the kitchen and accidentally cut his hand on one of the broken knives that he had used to stab Odessia and Hanessia. He grabbed another knife. Odessia had crawled from the master bedroom to the living room and was lying in her own blood. He rolled her over and continued his attack. Odessia's blood covered Knight's hands, so he wiped them on the carpet.

Knight further confessed that, after he finished with Odessia, he went to the bathroom, took off the blood soaked shorts and T-shirt, and tossed them under the sink. He showered and put on blue polo pants. He wiped down the knives in the living room. At that time, Knight heard a knock on the door and saw the police outside through the peep hole. He ran to his room and out the window. In an attempt to deflect suspicion away from himself, Knight returned to his bedroom window where he saw a female police officer.

Knight was charged by indictment on August 15, 2001, for the murders of Odessia Stephens and Hanessia Mullings. The jury found Knight guilty of both counts of first-degree murder.

*Id.* at 881-83 (footnote omitted).

The trial proceeded to the penalty phase, at the conclusion of which the jury unanimously recommended the death penalty for

each murder.  The trial court conducted a *Spencer*[1] hearing, following which the trial court sentenced Knight to death for the murders.

The court found the following aggravating factors as to the murder of Stephens: (1) a previous conviction of another violent capital felony (the contemporaneous murder of Mullings), and (2) the murder was especially heinous, atrocious, or cruel (HAC). *Knight*, 76 So. 3d at 884.  As to the murder of Mullings, the court found three aggravating factors: (1) a previous conviction of another violent capital felony (the contemporaneous murder of Stephens), (2) HAC, and (3) the victim was under twelve years of age.  *Id.*

The trial court found no statutory mitigation.  *Id.*  As nonstatutory mitigation, the court found (1) Knight had a good upbringing (slight weight), (2) Knight loves his family (moderate weight), (3) Knight went to high school and excelled in art (little weight), (4) Knight was admired by the children in his neighborhood as a youth and was well regarded by the adults (little weight), (5) Knight was a valuable employee in Jamaica (little weight),

---

1.  *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

(6) Knight had part-time employment at the time of the crime (little weight), (7) Knight behaved well in court (little weight), and (8) Knight is capable of forming loving relationships (moderate weight). *Id.* at 890.

Knight raised five issues during the direct appeal of his convictions and sentences: (1) the trial court abused its discretion by denying Knight's motion for mistrial based on Hans Mullings' comment that he knew Knight to have a violent background; (2) the trial court abused its discretion in denying Knight's motion for mistrial based on the allegation that jurors saw him wearing shackles; (3) the trial court erred in ruling that no discovery violation occurred and in denying Knight's motion for mistrial based on the State's expert's testimony regarding DNA evidence; (4) the trial court erred in denying Knight's motion to seat a new jury based on Mullings' testimony; and (5) the Florida death sentencing statute violates the Sixth Amendment and ignores *Ring v. Arizona,* 536 U.S. 584 (2002). *Knight,* 76 So. 3d at 885 n.3. This Court denied relief. *Id.* at 881.

Knight's convictions and sentences became final on May 14, 2012, when the United States Supreme Court denied certiorari

review.  *Knight v. Florida*, 566 U.S. 998 (2012); Fla. R. Crim. P. 3.851(d)(1)(B).

Since that time, Knight has unsuccessfully challenged his death sentences in state and federal courts.  *See Knight v. State,* 225 So. 3d 661 (Fla. 2017) (affirming denial of rule 3.851 initial motion for postconviction relief and denying habeas petition); *Knight v. Sec'y, Dep't of Corr.*, No. SC2025-0872, 2026 WL 1133632 (Fla. Apr. 27, 2026) (denying habeas relief); *Knight v. Jones*, 2018 WL 11656388, No. 17-61921-Civ-Scola (Apr. 30, 2018) (denying federal habeas petition); *Knight v. Jones*, 2018 WL 11656374, No. 17-61921-Civ-Scola (July 25, 2018) (denying rehearing of federal habeas petition and granting certificate of appealability on two issues); *Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322 (11th Cir. 2019), *cert. denied*, 141 S. Ct. 274 (2020) (affirming denial of federal habeas relief).

Governor Ron DeSantis signed Knight's death warrant on April 22, 2026.  On May 2, 2026, Knight filed in the circuit court a motion for stay of execution and a successive motion for postconviction relief under rule 3.851 raising three claims: (1) Knight's convictions and sentences are unreliable and violate the

Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Florida Constitution; (2) an unreasonably truncated death warrant process and the surprise nature of the process have unconstitutionally deprived Knight of a fair and meaningful postconviction process; and (3) under the "Specific Procedures" set forth in the Florida Department of Corrections' Execution by Lethal Injection Procedures,[2] section 10(i) violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment by authorizing unqualified execution team members to perform venous cut-down surgery without the use of local anesthesia.  Knight also filed a motion to compel the Broward County Sheriff's Office (BCSO) to perform additional analysis of an unidentified print of value and a motion to accept as timely filed a doctor's report in support of his lethal injection claim.

The circuit court held a *Huff*[3] hearing on May 5, 2026,

2.  Fla. Dep't of Corr., *Execution by Lethal Injection Procedures* and *Certification Letter* (2025), https://fdc-media.ccplatform.net/content/download/1561/file/Execution%20by%20Lethal%20Injection%20with%20Certification%20Letter.pdf.

3.  *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

following which the court entered its written order summarily denying all three claims and Knight's post-warrant motions. This appeal follows.

## II. ANALYSIS

The "[s]ummary denial of a successive postconviction motion is appropriate '[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief.' " *Owen v. State*, 364 So. 3d 1017, 1022 (Fla. 2023) (second alteration in original) (quoting *Bogle v. State*, 322 So. 3d 44, 46 (Fla. 2021)). We review the circuit court's decision de novo, "accepting the movant's factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief." *Id.* at 1022-23 (quoting *Walton v. State*, 3 So. 3d 1000, 1005 (Fla. 2009)).

Knight's successive postconviction appeal raises three issues. We address each issue in turn and explain why Knight is not entitled to relief.

### A. Unidentified Print

Knight's first issue on appeal involves an unidentified print of value found on one of the knife blades used in the murders. In his

successive rule 3.851 motion, Knight provisionally asserted that if identified, the print would potentially constitute newly discovered evidence and would undermine his convictions and his sentences of death. At the same time, Knight pursued a motion to compel the BCSO to again run the print through the Automated Fingerprint Identification System (AFIS). The print was run through AFIS before Knight's murder trial and the system did not reveal a match. The circuit court denied this claim as untimely, procedurally barred, and without merit, and it also denied Knight's motion to compel. Knight maintains that the circuit court erred in denying both. We affirm the court's denial of relief.

Under Florida Rule of Criminal Procedure 3.851(d)(1), a motion for postconviction relief must be filed within one year of the date that a conviction and sentence become final. Knight, however, relying on an exception provided in rule 3.851(d)(2)(A), provisionally asserted that the print potentially constitutes newly discovered evidence warranting relief. *See* Fla. R. Crim. P. 3.851(d)(2)(A) ("No motion may be filed or considered under this rule if filed beyond the time limitation provided in subdivision (d)(1) unless it alleges: the facts on which the claim is predicated were unknown to the movant

or the movant's attorney and could not have been ascertained by the exercise of due diligence . . . .").

To obtain relief on a claim of newly discovered evidence, Knight must demonstrate the following:

> First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."
>
> Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.

*Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (alteration in original) (citations omitted). Moreover, because Knight seeks to vacate his death sentences, to establish the second prong of *Jones*, he must also show "that the newly discovered evidence would probably yield a less severe sentence." *Long v. State*, 271 So. 3d 938, 942 (Fla. 2019) (quoting *Walton v. State*, 246 So. 3d 246, 249 (Fla. 2018)).

As to the merits of this claim, the circuit court concluded:

> Even if this Court determined this claim was not untimely and was not procedurally barred (which this Court does not find) the State argues and this Court agrees this claim is without merit. This Court notes testimony regarding the unidentified single readable print was considered by the jury who subsequently convicted

- 12 -

the Defendant of 2 counts of first degree murder based on the overwhelming evidence of the Defendant's guilt presented at trial. This Court finds even if this unidentified single readable print was now identified to some individual it would not probably produce an acquittal on retrial.

The circuit court did not err in denying Knight's newly discovered evidence claim nor in denying his motion to compel. The unidentified print was known to Knight at the time of his trial in 2006, was run through AFIS before trial, was addressed at trial, and was the subject of both direct and cross-examination. Thus, the jury was aware of the print when determining whether to convict Knight of the murders and whether to recommend that he be sentenced to death. The jury convicted Knight and recommended the death penalty, having been presented with substantial forensic evidence as well as evidence of (1) the circumstances leading up to the murders, (2) Knight's proximity to the crime scene after the murders, and (3) Knight's own confession.

When considering the alleged newly discovered evidence in the context of the other evidence on which the State relied to obtain the convictions, Knight has not established that he would probably be acquitted on retrial. The jury considered evidence that Knight lived

at the apartment where the murders took place and had been asked to move out.  A shirt, boxers, and a pair of shorts found under the sink in the bathroom near Knight's bedroom belonged to Knight, and each item was stained with the blood of one or both of the victims.  Stephens's blood was also found on Knight's hand and on the clothing that he was wearing when he was arrested.  Law enforcement encountered Knight, who was visibly wet, near the apartment shortly after the murders occurred, and wet towels were found in Knight's bedroom.  What is more, fingernail scrapings obtained from Stephens contained the DNA profile of Knight, who "had a scratch on his chest, a scrape on his shoulder, and fresh cuts on his hands" when law enforcement encountered him after the murders.  Finally, Knight recounted detailed circumstances of the murders to a fellow inmate at the Broward County Jail.

Knight maintains that the alleged newly discovered evidence would lead to the striking of the HAC aggravating factor as to each murder and that as a result, he would receive lesser sentences.  We disagree, and, given the facts of this case, are particularly unpersuaded by Knight's HAC argument.  As aggravating factors in this case, the circuit court found that Knight was convicted of the

- 14 -

violent contemporaneous first-degree murders of the victims and, as to the murder of Mullings, the murder of a victim under 12 years of age. Knight is not entitled to relief.

## B. Lethal Injection Procedure

Knight's second issue focuses on one possible aspect of an execution, the use of a cut-down procedure to achieve the placement of a venous central line. Knight argues that section 10(i) of the "Specific Procedures" set forth in the Execution by Lethal Injection Procedures violates the prohibition against cruel and unusual punishment, and he suggests that it permits unqualified execution team members to perform a venous cut-down procedure without the use of local anesthesia. Knight also argues that the circuit court erred by refusing to consider a report submitted by Dr. Joel Zivot. The circuit court denied relief, finding the lethal injection claim untimely, procedurally barred, and legally insufficient. We affirm the denial of relief.

Sections 10(h) and 10(i) address achieving the venous access necessary to carry out an execution. Generally, the medical team attempts to achieve peripheral venous access. If peripheral access is unattainable, if necessary, the medical team may attempt to

achieve central venous access.  Sections 3(a) and 3(b) of the "Specific Procedures" specify the classes of medical professionals from whom the warden *shall* select to achieve and monitor peripheral and central venous access, and the classes of individuals eligible to achieve and monitor central venous access are more limited than those eligible to achieve and monitor peripheral venous access.  Should central venous access be necessary, pursuant to section 3(b), the selected execution team member *shall* be selected "from the following classes of trained professionals: an advanced practice registered nurse licensed under Chapter 464, Florida Statutes; or, a physician or physician's assistant licensed under Chapter 458 or Chapter 459, Florida Statutes."  "The warden shall select personnel with sufficient training and experience to perform the technical procedures necessary to carry out an execution, including the mixing of the chemicals and placement of the venous access lines."  § 3, *Execution by Lethal Injection Procedures* and *Certification Letter* (2025).

Moreover, approximately one week prior to the execution, one or more execution team members review the inmate's medical file, conduct a limited medical evaluation of the inmate and, in

consultation with the warden, "shall conclude what is the more suitable method of venous access . . . given the individual circumstances of the condemned inmate based on all information provided." § 8(a), *Execution by Lethal Injection Procedures* and *Certification Letter* (2025). As acknowledged in section 10(i), the process of achieving central venous access may or may not involve a more involved procedure commonly referred to as a venous cut-down procedure. Knight does not allege that he will be subject to this procedure.

The crux of Knight's argument is that an execution requiring a venous cut-down procedure constitutes cruel and unusual punishment in the absence of an express requirement of the use of local anesthesia, and that the lethal injection procedures permit unqualified personnel to conduct the procedure. We affirm the denial of relief.

First, Knight's claim is untimely. The current procedures for execution by lethal injection were adopted on February 18, 2025. Under rules 3.851(d)(1) and 3.851(d)(2)(A), Knight was required to raise this claim within one year after his judgments and sentences became final or "within one year of the date such evidence was

discovered or could have been discovered through the exercise of due diligence." *Gudinas v. State*, 412 So. 3d 701, 709 (Fla.) (quoting *Glock v. Moore*, 776 So. 2d 243, 251 (Fla. 2001)), *cert. denied*, 145 S. Ct. 2833 (2025). However, Knight did not raise this claim until the filing of his post-warrant successive postconviction motion on May 2, 2026. And, we observe that the reference to the venous cut-down procedure long predates the February 18, 2025, adoption of the current procedures.

Second, the claim is procedurally barred, as it could have been raised in an earlier proceeding. Indeed, Knight challenged the constitutionality of Florida's lethal injection procedures in his initial 3.851 proceedings. *See Knight*, 225 So. 3d at 680 ("Knight argues that Florida's administration of the death penalty by lethal injection constitutes cruel and unusual punishment, in violation of the Eight[h] Amendment.").

Third, Knight's claim is meritless, as his allegations fail to "(1) establish that the method of execution presents a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering and (2) identify a known and available alternative method of execution that entails a significantly less

- 18 -

severe risk of pain." *Asay v. State*, 224 So. 3d 695, 701 (Fla. 2017) (citing *Glossip v. Gross*, 576 U.S. 863, 877 (2015)). The circuit court did not err in denying an evidentiary hearing on nor in summarily denying this claim, as we have explained that "speculative and conclusory allegations that lethal injection protocols present a substantial risk of serious harm are insufficient to warrant an evidentiary hearing." *Heath v. State*, 426 So. 3d 1253, 1261 (Fla.) (citing *Cole v. State*, 392 So. 3d 1054, 1065 n.18 (Fla. 2024)), *cert. denied*, No. 25-6746, 2026 WL 363902 (U.S. Feb. 10, 2026). Knight's allegations do not rise to the level of an Eighth Amendment violation, as they do not demonstrate "a substantial and imminent risk that is sure or very likely—in other words, a virtual certainty—to cause serious illness and needless suffering." *Id.* at 1262.

### C. Due Process

In Knight's third issue, he argues that the structure of Florida's warrant process, both facially and as applied to him, is constitutionally deficient. He argues that the expedited process has deprived him of meaningful collateral proceedings to challenge his convictions and sentences of death. The circuit court denied

Knight's due process claim, concluding that he received both notice and an opportunity to be heard.  We agree and affirm.

We have repeatedly considered and rejected claims challenging the time period set in recent death warrant cases.  *See Zakrzewski v. State*, 415 So. 3d 203, 210-11 (Fla.) (rejecting claim that expedited warrant process constituted a deprivation of due process and meaningful access to the courts), *cert. denied*, 146 S. Ct. 57 (2025); *Bell v. State*, 415 So. 3d 85, 106-07 (Fla.) (rejecting due process argument challenging expedited warrant timeframe), *cert. denied*, 145 S. Ct. 2872 (2025); *Tanzi v. State*, 407 So. 3d 385, 390 (Fla.) (stating that "[t]he warrant litigation schedule does not violate Tanzi's due process rights"), *cert. denied*, 145 S. Ct. 1914 (2025); *Barwick v. State*, 361 So. 3d 785, 789-90 (Fla. 2023) (rejecting appellant's denial of due process argument and noting that while the occurrence of certain circumstances coincided with the death warrant period, "none of the obstacles identified . . . resulted in a denial of due process").

## III. CONCLUSION

For these reasons, we affirm the denial of Knight's successive motion for postconviction relief and decline to order a stay of

execution.

No oral argument is required, no motion for rehearing will be considered, and the mandate shall issue immediately.

It is so ordered.

MUÑIZ, C.J., and LABARGA, COURIEL, GROSSHANS, FRANCIS, SASSO, and TANENBAUM, JJ., concur.

An Appeal from the Circuit Court in and for Broward County,
    Martin S. Fein, Judge – Case No. 062001CF014055A88810

Suzanne Keffer, Capital Collateral Regional Counsel, Todd G. Scher, Assistant Capital Collateral Regional Counsel, and Michael T. Cookson, Staff Attorney, Southern Region, Fort Lauderdale, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, Lisa-Marie Lerner, Senior Assistant Attorney General, West Palm Beach, Florida, and Leslie T. Campbell, Senior Assistant Attorney General, West Palm Beach, Florida,

    for Appellee