# Supreme Court of Florida

_____

No. SC14-1775
_____

**RICHARD KNIGHT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC15-1233
_____

**RICHARD KNIGHT,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[January 31, 2017]

PER CURIAM.

Richard Knight appeals an order of the Seventeenth Judicial Circuit Court in

and for Broward County denying his motion to vacate his sentence of death filed

under Florida Rule of Criminal Procedure 3.851. Knight also petitions this Court

for a writ of habeas corpus.  See art. V, § 3(b)(1), (9), Fla. Const.  For the reasons

discussed below, we affirm the circuit court's denial of Knight's rule 3.851 motion

and deny his petition for a writ of habeas corpus.

## I.  STATEMENT OF THE CASE & FACTS

On April 26, 2006, a jury found Richard Knight guilty of two counts of first-

degree murder for the deaths of Odessia Stephens and her four-year-old child,

Hanessia Mullings.  The jury unanimously recommended a death sentence for each

murder.  Knight v. State, 76 So. 3d 879, 884 (Fla. 2011).

## A.  Trial & Direct Appeal Proceedings

On direct appeal, we set forth the following relevant factual and procedural

background:

> The evidence presented at trial established that Knight lived in
> an apartment with his cousin, Hans Mullings, Mullings' girlfriend,
> Odessia Stephens, and their daughter, Hanessia Mullings.  Mullings
> and Odessia had asked Knight to move out numerous times.
> On the night of the murder, June 27, 2000, Mullings was at
> work.  At approximately 9 p.m., Mullings spoke to Odessia, who said
> she was going to bed, and then Mullings left his office to run errands.
> Knight was at the apartment with Odessia and Hanessia.
> Around midnight, an upstairs neighbor heard multiple thumping
> sounds on the apartment walls and two female voices, one of which
> was a child crying.  The neighbor called 911 at 12:21 a.m. on June 28,
> 2000.  The cries continued after the police arrived.
> Officer Vincent Sachs was the first to respond.  He arrived at
> 12:29 a.m. and noted that the lights were on in the master bedroom
> and hall area, and that a second bedroom's window was slightly ajar.
> After knocking and receiving no response, he walked around the unit
> and noticed that the lights had been turned off and that the previously
> ajar window was now completely open and blinds were hanging out

of it.  Sachs shined his flashlight through the dining room window.  He saw blood in the dining room and master bedroom.  Further, he noticed Hanessia curled in the fetal position against the closet door.  Once inside, he observed Odessia's body in the living room.  All of the doors were locked and there had been no ransacking of the apartment.

Officer Natalie Mocny arrived next and walked around the unit.  She also saw the open window and noticed Knight on the other side of some hedges approximately 100 yards from the building.  She beckoned him over for questioning.  Officer Sachs joined Mocny.  According to the officers, Knight had a scratch on his chest, a scrape on his shoulder, and fresh cuts on his hands.  Although it was not raining, Knight was visibly wet.  Knight was wearing dress clothes and shoes, yet told Mocny that he had been jogging, and that he lived in the apartment, but did not have a key to get inside.  There was blood on the shirt he was wearing and on a ten-dollar bill in his possession.

The crime scene investigation recovered two wet towels in Knight's bedroom, a shirt, boxers, and a pair of jean shorts under the sink in the bathroom near Knight's bedroom, all of which belonged to Knight and had numerous bloodstains.  Two knife blades were also recovered, one from under the mattress in the master bedroom, and another from under Odessia's body.

Odessia's blood was found in the master bedroom between the bed and the wall, on the master bedroom blinds, on the living room carpet, on the knives' handles and blades, and on the knife holder in the kitchen.  Odessia's blood was also discovered on Knight's boxers, shirt, jean shorts, the clothing Knight had been wearing when arrested, and his hand.  Fingernail scrapings taken from Odessia contained Knight's DNA profile.

Hanessia's blood was found on one of the knives, on Knight's boxers, jean shorts, and on the shower curtain.  The shower curtain also contained the blood of Knight's acquaintance, Victoria Martino.

Dr. Lance Davis, the medical examiner, observed the bodies at the scene.  Odessia was found on the living room floor near the entrance with several broken knife pieces around her.  She had twenty-one stab wounds: fourteen in the neck, one on the chin, and the rest on her back and chest.  Additionally, she had twenty-four puncture or scratch wounds and bruising and ligature marks on her neck.  The bruises appeared to have been made by a belt or similar

object.  She also had defensive wounds on both hands and wounds on her leg, chest, back and neck.  Several of the knife wounds were fatal but none would have resulted in an instantaneous death.  She had bruises from being punched on her scalp and mouth.  Davis opined that Knight began his attack in the bedroom with Odessia fleeing to the living room.  He estimated that Odessia was conscious for ten to fifteen minutes after the attack.

Davis discovered Hanessia on the floor next to the closet door.  There were broken knife pieces around her.  She had a total of four stab wounds in her upper chest and neck.  Her hand had one additional stab wound and numerous defensive wounds.  Hanessia's arms and upper body had numerous bruises and scratches.  There were bruises on her neck that were consistent with manual strangulation and bruises on her arms consistent with being grabbed.

Stephen Whitsett and Knight were housed together from June 29, 2000, to July 22, 2000, at the Broward County Jail.  Knight confessed to Whitsett about the murders as follows: The night of the murders Knight and Odessia argued.  She told him that she did not want to support him and that he would have to move.  He asked for some more time because he had just gotten a job, but Odessia refused and told him to leave in the morning.  Knight left the house to go for a walk and he became increasingly angry.  He returned that night, confronted Odessia in her room, and they argued.

Knight went to the kitchen and got a knife.  When he went back to the master bedroom, Odessia was on one side of the bed and Hanessia was on the other.  He began by stabbing Odessia multiple times.  Odessia eventually stopped defending herself and balled up into a fetal position.  Knight then turned to four-year-old Hanessia.  The knife broke while he was stabbing Hanessia, so he returned to the kitchen for another.  Upon returning, Knight saw Hanessia had crawled to the closet door and was drowning in her own blood.

Again, Knight returned to the kitchen and accidentally cut his hand on one of the broken knives that he had used to stab Odessia and Hanessia.  He grabbed another knife.  Odessia had crawled from the master bedroom to the living room and was lying in her own blood.  He rolled her over and continued his attack.  Odessia's blood covered Knight's hands, so he wiped them on the carpet.

Knight further confessed that, after he finished with Odessia, he went to the bathroom, took off the blood soaked shorts and T-shirt, and tossed them under the sink.  He showered and put on blue polo

pants. He wiped down the knives in the living room. At that time, Knight heard a knock on the door and saw the police outside through the peep hole. He ran to his room and out the window. In an attempt to deflect suspicion away from himself, Knight returned to his bedroom window where he saw a female police officer.

Knight was charged by indictment on August 15, 2001, for the murders of Odessia Stephens and Hanessia Mullings. The jury found Knight guilty of both counts of first-degree murder.

At the penalty phase, Knight called six witnesses, several of whom testified about his childhood and upbringing in Jamaica. His teacher, Joscelyn Walker, told the jury that Knight was a respectful and loving boy raised in a very respected family. He said that Knight did have a temper when provoked and would become extremely frustrated at times. Walker had to restrain him from time to time when Knight wanted to fight another child. Knight's high school art teacher, Joscelyn Gopie, described Knight as a pleasant, eager boy who was quite talented at art. Gopie explained that Knight was adopted as a toddler by his family. Knight left high school before he graduated.

Barbara Weatherly is the mother of Knight's former fiancée. She described him as a decent, honorable guy who respected her rules regarding her daughter. He always helped her younger children with their drawing. He was a quiet and peaceful person who spent a lot of time alone. One night at her house he got sick; his eyes rolled back in his head and he frothed at the mouth before passing out. They took him to the hospital where the doctor said that he needed to see a psychiatrist. She last saw him in 1998 when he left to go to the United States.

A former boss and coworker of Knight's, Stanley Davis, also testified. Davis explained that Knight had been adopted into a well respected family and had a close loving relationship with his family members. Knight took over many of his father's duties when his father lost a leg. Knight worked with him at a construction company and was a good worker. On one occasion Knight fell and blacked out, after which he had difficulty concentrating and became timid.

Valerie River, the defense investigator, and Knight's attorney journeyed to Jamaica to interview Knight's family and friends. Knight was abandoned by his mother and the Knight family found him at a hospital and took him home. He was a good brother and son. Knight's close friends and family said that he was a nice and good

person. Knight's sister-in-law used to have Knight babysit her children but eventually stopped because he was careless around the house. Knight blacked out on one occasion. Knight's former boss Stedman Stevenson said he was a hard worker and a quick learner. He took Knight to Florida, and Knight decided to stay.

Knight also presented expert Dr. Jon Kotler who practices nuclear medicine and specializes in PET scans of the brain. He explained that Knight's physical symptoms indicated that he might have a brain injury. The MRI done on him was normal. Dr. Kotler did a PET scan which he interpreted as showing asymmetrical brain activity indicating possible pathology of the brain, perhaps a seizure disorder. He could not say exactly what the pathology might be or how it might manifest itself in Knight's behavior. Dr. Sfakianakis, another nuclear medicine doctor, read the PET results as showing only a mild difference between the brain hemispheres which was within the normal fluctuations of the brain.

Following the presentation of penalty-phase testimony, the jury unanimously recommended the death penalty for both murders.

The trial court subsequently conducted a [Spencer v. State, 615 So. 2d 688 (Fla. 1993),] hearing on August 18, 2006. At the hearing, the defense submitted the report and deposition of neuropsychologist Dr. Mittenberg who examined Knight but refused to testify at trial. The State submitted the report and deposition of Dr. Lopickalo, another neuropsychologist. Mullings and Eunice Belan also gave victim impact statements.

Subsequent to the Spencer hearing, the trial court followed the jury's [unanimous] recommendation and sentenced Knight to death. In pronouncing Knight's sentence, the trial court determined that the State had proven beyond a reasonable doubt two statutory aggravating circumstances for the murder of Odessia Stephens: (1) a previous conviction of another violent capital felony, and (2) that the murder was especially heinous, atrocious, or cruel (HAC). The court also found three statutory aggravating circumstances for the murder of Hanessia Mullings: (1) a previous conviction of another violent capital felony, (2) HAC, and (3) the victim was under twelve years of age. The court found no statutory mitigating circumstances but found eight nonstatutory mitigators, which are set forth in our proportionality discussion.

Knight, 76 So. 3d at 881-84 (footnote and headings omitted).  On direct appeal, Knight raised five claims: (1) the trial court abused its discretion by denying Knight's motion for a mistrial based on Hans Mullings' comment that he knew Knight to have a violent background; (2) the trial court abused its discretion in denying Knight's motion for a mistrial based on the allegation that jurors saw him wearing shackles; (3) the trial court erred in ruling that no discovery violation occurred and in denying Knight's motion for a mistrial based on the State's expert's testimony regarding DNA evidence; (4) the trial court erred in denying Knight's motion to seat a new jury based on Mullings' testimony; and (5) Florida's death sentencing statute violates the Sixth Amendment and ignores Ring v. Arizona, 536 U.S. 584 (2002).  Knight, 76 So. 3d at 885. n.3.

We affirmed Knight's convictions and sentence of death.  Id. at 885. Knight's sentence became final on May 14, 2012, when the United States Supreme Court denied certiorari.  Knight v. Florida, 132 S. Ct. 2398 (2012) (Mem).

## B.  Postconviction Relief Proceedings

On May 10, 2013, Knight filed his "Motion to Vacate Judgment of Conviction and Sentence with Special Request for Leave to Amend," pursuant to Florida Rule of Criminal Procedure 3.851.  He raised the following claims: (1) he was improperly denied access to public records; (2) the one-year deadline in Florida Rule of Criminal Procedure 3.851 was unconstitutionally applied to him;

(3) he was denied adversarial testing at the guilt phase; (4) he was denied adversarial testing at the penalty phase; (5) the rule prohibiting juror interviews is unconstitutional; and (6) Florida's lethal injection protocol and procedures are unconstitutional. The circuit court granted an evidentiary hearing on Knight's claims. The evidentiary hearing took place on March 27 and 28, 2014, when the circuit court heard testimony on Knight's claims of ineffective assistance of counsel. On July 30, 2014, the circuit court denied all of Knight's claims for postconviction relief.

## II.  POSTCONVICTION RELIEF CLAIMS

### A.  Ineffective Assistance of Counsel During Guilt Phase

Knight argues that he is entitled to a new trial because trial counsel rendered ineffective assistance. First, Knight argues that trial counsel was ineffective for failing to call as a witness Dr. Nora Rudin, a DNA analyst who worked for the defense prior to trial. Second, Knight argues that trial counsel was ineffective for failing to request a Frye[1] hearing to examine the reliability of the DNA testing procedures employed by the State. Third, Knight argues that trial counsel failed to discover and introduce a memorandum from one of the State's experts requesting a

---

1. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)

- 8 -

voluntary demotion. For the reasons below, we conclude that the postconviction court did not err in denying Knight's claims of ineffective assistance of counsel.

In accordance with Strickland v. Washington, 466 U.S. 668 (1984), to obtain relief on a claim of ineffective assistance of counsel, a defendant must establish

> deficient performance and prejudice, as set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Rutherford v. State, 727 So. 2d 216, 218 (Fla. 1998). As to the first prong, deficient performance, a defendant must establish conduct on the part of counsel that is outside the broad range of competent performance under prevailing professional standards. See Strickland, 466 U.S. at 688. Second, as to the prejudice prong, the deficient performance must be shown to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined. See id. at 694; Rutherford, 727 So. 2d at 220.
>
> Gore v. State, 846 So. 2d 461, 467 (Fla. 2003) (parallel citations omitted).
>
> "[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." Waterhouse v. State, 792 So. 2d 1176, 1182 (Fla. 2001). Further, as the United States Supreme Court explained in Strickland,

> > [j]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . .

> 466 U.S. at 689.

Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006). "In reviewing a trial court's ruling after an evidentiary hearing on an ineffective assistance of counsel claim, this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts." Id. at 998 (citing Stephens v. State, 748 So. 2d 1028, 1031-32 (Fla. 1999))." With this standard of review in mind, we turn to Knight's arguments of ineffective assistance of counsel.

### 1. Failure to Call Dr. Rudin

At trial, the State's DNA evidence was presented through the testimony of Kevin Noppinger of the Broward County Sheriff's Office, who conducted the actual DNA testing, and Kevin McElfresh of Bode Technology Group, who analyzed Noppinger's results. Dr. Rudin worked for Knight's defense team. She employed Noppinger's analysis to develop a report and aid the defense.

Originally, McElfresh opined that Knight's DNA could be excluded from the DNA samples obtained from the clothing found below the sink at the crime scene. Knight, 76 So. 3d at 887. However, at trial McElfresh testified that Knight's DNA could not be excluded from the shorts and boxers found in the bathroom at the crime scene. Id. McElfresh explained that Knight's DNA could no longer be excluded because an additional sample, that of Victoria Martino, Knight's girlfriend, was tested, and it changed the outcome of the initial analysis.

- 10 -

Defense counsel objected to the testimony as a discovery violation, but the objection was denied. Id. Defense counsel called Dr. Rudin and relayed McElfresh's testimony. He then sent her a transcript of the testimony of the State's expert. She explained to Knight's counsel that even with the new sample, she agreed with Noppinger's DNA analysis. Later, while the trial was ongoing, Dr. Rudin produced a second report, dated April 28, 2006. The report stated that the DNA procedures may have had some errors and that McElfresh's testimony was not scientifically sound. Notably, Dr. Rudin's second report ultimately supported the State's DNA findings.

At the postconviction evidentiary hearing, trial counsel explained that he did not call Dr. Rudin as a witness because her conclusions ultimately bolstered the State's arguments. Trial counsel also stated that because the rule at the time allowed the defense to have the last word, he did not want to lose that opportunity.

Dr. Rudin also testified at the evidentiary hearing. She testified that her second report addressed her concerns with Noppinger's DNA testing procedures and with McElfresh's analysis of that testing as it pertained to the clothes found in the bathroom. Dr. Rudin found McElfresh's trial testimony problematic, explaining that his conclusions were questionable because he arrived at them through an unreliable testing method. However, even with the possibly flawed

- 11 -

procedures, Dr. Rudin stated that she would have testified consistent with Noppinger's report.

Knight now argues that trial counsel was ineffective for failing to call Dr. Rudin as a witness. He posits that had she testified at trial, the jury would have doubted the State's DNA evidence and ultimately would have found him innocent. While it is possible that Dr. Rudin's testimony may have cast doubt on the State's DNA evidence, we conclude that Knight fails to meet either prong of Strickland.

This Court has stated that "[a]s long as the trial court's findings are supported by competent substantial evidence, 'this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.' " Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997) (quoting Demps v. State, 462 So. 2d 1074, 1075 (Fla. 1984)); see also Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007) (noting that the trial court is frequently in a superior position to evaluate the testimony based upon its observation of the bearing, demeanor, and credibility of the witnesses) (quoting Stephens v. State, 748 So. 2d 1028, 1034 (Fla. 2009)).

The record reveals competent, substantial evidence to support the postconviction court's finding that defense counsel's decision not to present Dr. Rudin during the guilt phase was a reasonable trial strategy. At Knight's

evidentiary hearing, trial counsel testified that he made a strategic decision before trial not to call Dr. Rudin as a witness because her original report supported the State's conclusions. Trial counsel also stated that prior to trial, he asked Dr. Rudin whether she would call herself as a witness, and she said that she would not because she could not help Knight's case. Moreover, her report ultimately concluded that her findings were consistent with Noppinger's conclusions and that McElfresh's unreliable testimony was "inconsequential."

Knight also cannot establish that trial counsel's actions or omissions were prejudicial to him. To establish prejudice, Knight must establish that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In reviewing the prejudice prong, the postconviction court concluded that even if Dr. Rudin had testified, there was no reasonable probability that the outcome of the trial would have been different in light of the other evidence presented by the State. We agree.

At trial, the State presented evidence that Knight lived with the victims, he had ongoing disagreements with one of the victims, and he was at the apartment on the night of the murders. Knight, 76 So. 3d at 881. The State also showed that on the night of the murders, Knight told a detective that he had been out for a run, yet Knight was wearing a dress shirt, slacks, and dress shoes. Id. at 882. Accordingly, trial counsel's actions did not prejudice Knight.

## 2. Failure to Request a Frye Hearing Regarding DNA Evidence

Knight asserts that trial counsel was ineffective for failing to request a hearing pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Knight argues that a Frye hearing would have shown that the State's DNA expert employed unreliable testing procedures and, thus, exponentially weakened the State's case. We disagree.

As a general rule, a Frye hearing is "utilized in Florida only when the science at issue is new or novel." Overton v. State, 976 So. 2d 536, 550 (Fla. 2007) (quoting Branch v. State, 952 So. 2d 470, 483 (Fla. 2006). The Frye test places the burden of proof "on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand." Id. (quoting Ramirez v. State, 651 So. 2d 1164, 1168 (Fla. 1995)). Where the testing procedures are at issue, "DNA test results are generally accepted as reliable in the scientific community, provided that the laboratory has followed accepted as reliable testing procedures" to prevent false readings and contamination. Id.

To show deficiency, Knight must specifically identify acts or omissions of counsel that were manifestly outside the wide range of reasonable, competent performance under prevailing norms. Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010). Knight argues that counsel was aware of the deficiencies of the DNA

testing by Noppinger and, as such, should have requested a <u>Frye</u> hearing.  We reject Knight's argument because there is competent, substantial evidence supporting the postconviction court's denial of Knight's claim.

Noppinger and trial counsel both testified at the evidentiary hearing that the "Preliminary Chain Reaction and Short Tandem Repeats" techniques employed in this case were generally accepted by the community at the time of Knight's trial.  Second, even though Dr. Rudin pointed out the possible flaws in Noppinger's labeling procedures, her report and testimony at the evidentiary hearing supported Noppinger's scientific conclusions.  It seems that although the labeling procedures were different, Dr. Rudin was unable to actually find any errors, and counsel would not have had a reason to challenge the DNA methodology to exclude the evidence.  Counsel cannot be deficient for failing to make an ultimately fruitless request.  Likewise, because a <u>Frye</u> hearing would not have resulted in the exclusion of the State's DNA evidence, the absence of a <u>Frye</u> hearing did not prejudice Knight.

### 3.  Failure to Locate Evidence

Third, Knight alleges that trial counsel was ineffective for failing to locate a memorandum prepared by Kevin Noppinger, in which Noppinger requested a voluntary demotion.  The entirety of Knight's argument in his initial brief is comprised of two sentences that do not cite any case law or refer to any facts that

could have supported his argument that trial counsel was ineffective for failing to locate Noppinger's memorandum. Accordingly, we conclude that this claim is insufficiently pled. See Bryant v. State, 901 So. 2d 810, 827 (Fla. 2005) (holding a claim is insufficiently pled when the entire argument is contained in a phrase, and stating that "[s]uch a cursory argument is insufficient to preserve the issue for consideration").

**B. Ineffective Assistance of Counsel During Penalty Phase**

Knight also asserts that trial counsel was deficient during the penalty phase of trial. First, Knight argues that trial counsel was ineffective for failing to properly investigate and introduce mitigating evidence regarding child abuse that Knight allegedly endured. Second, Knight argues that counsel was ineffective for failing to ensure that he was examined by a competent mental health expert. We disagree with both arguments.

The postconviction court found that Knight was unsuccessful on both claims because he did not present any evidence during the hearing regarding a history of abuse or his alleged brain injury. Further, the court reasoned that counsel had presented all social and personal history known to him in the form of several witnesses who knew Knight as a child, a witness who knew of his seizures and blackouts, and testimony from the defense investigator who interviewed many members of Knight's adoptive family. For the reasons below, we conclude that

there is competent, substantial evidence supporting the postconviction court's order denying Knight's claims.

With respect to the investigation and presentation of mitigation evidence, the Supreme Court of the United States observed that <u>Strickland</u> does not require "counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does <u>Strickland</u> require defense counsel to present [mitigating] evidence at sentencing in every case." <u>Wiggins v. Smith</u>, 539 U.S. 510, 512 (2003). Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable. "When making this assessment, 'a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.' " <u>Taylor v. State</u>, 62 So. 3d 1101, 1110 (Fla. 2011) (quoting <u>Wiggins</u>, 539 U.S. at 527) (citations omitted); <u>see also</u> <u>Lebron v. State</u>, 135 So. 3d 1040, 1062 (Fla. 2014) ("One of our principle concerns in deciding whether counsel exercised reasonable professional judgment during a penalty phase proceeding is whether counsel should have presented a mitigation case. We also

focus on whether the investigation supporting counsel's decision to not introduce certain mitigating evidence was itself reasonable.").

### 1. Sexual Abuse

The State argues that Knight did not pursue this claim at the evidentiary hearing, but the record reflects that Knight did argue this claim and introduced the investigator's report as evidence. Thus, we conclude that Knight did not waive his argument that counsel was ineffective for failing to investigate his background and possible sexual abuse.

This Court has repeatedly considered claims of ineffective assistance of counsel during the penalty phase of a trial. See Brooks v. State, 175 So. 3d 204 (Fla. 2015); Diaz v. State, 132 So. 3d 93, 114 (Fla. 2013). In Diaz, this Court reiterated that "trial counsel was not ineffective for failing to discover that the defendant was sexually abused when the defendant and his family were not forthcoming with the information, even though trial counsel was aware of the defendant's rough childhood." Id. at 114. In Diaz, trial counsel testified at the evidentiary hearing that Diaz and Diaz's family were not forthcoming with information about Diaz's alleged sexual abuse. Id.

Here, we conclude that the postconviction court's denial of Knight's claim is supported by competent, substantial evidence. At trial, counsel presented testimony from Knight's teachers, who testified regarding Knight's family,

Knight's personality, and his bad temper when provoked. Knight, 76 So. 3d at 883-84. During the evidentiary hearing, counsel testified that while investigating Knight's background, counsel traveled to Jamaica, where Knight grew up. Trial counsel also stated that he "spent a great deal of time" getting to know Knight's family and teachers. Trial counsel testified that Knight's family was "very cooperative" and that at no time during the many conversations with family and friends, did Knight's alleged sexual abuse come up. Further, counsel testified that he did not recall ever being notified by Knight or others that Knight had been sexually abused as a child. Counsel was shown an investigative report in which Knight's sister said that an aunt once told that her that Knight may have been abused as a child. The report also stated that the same sister said she was reassured by another family member that this was not true and no such claims had been made. To this, counsel testified that he had never once heard from a family member or Knight that there had been sexual abuse. Because we uphold the postconviction court's finding that Knight's trial counsel was not deficient for failing to discover this childhood abuse, we decline to address whether this failure prejudiced Knight.

### 2. Mental Health Mitigation

Dr. Mittenberg was the defense's mental health expert. He performed tests on Knight and determined that Knight suffered from a brain abnormality. This

- 19 -

determination was further supported by Knight's PET scans. Knight's trial counsel testified at the evidentiary hearing that he was relying on Dr. Mittenberg's testimony to show that Knight's brain abnormality impacted his behavior and to prove the mitigator that on the night of the crime, Knight was unable to control his behavior. However, during trial but before Dr. Mittenberg was scheduled to testify, he notified trial counsel that he would not be testifying due to emotional distress. Counsel later discovered from Dr. Mittenberg's attorney that the emotional distress was caused by his excessive drinking, which began because he believed that he had committed a federal crime by inappropriately scoring Knight's Minnesota Multiphasic Personality Inventory (MMPI). A hearing was held, during which Dr. Mittenberg asserted his Fifth Amendment privilege, and trial counsel moved for a mistrial. Trial counsel's motion was denied, but the court granted a two-month recess to find another mental health expert. Trial counsel then hired Dr. Arias, who was unable to replicate Dr. Mittenberg's results and was unable to confirm that Knight had a brain abnormality. During the penalty phase of trial, trial counsel could have introduced Dr. Mittenberg's pretrial deposition as well as the report of his findings. However, at the evidentiary hearing, trial counsel testified that he did not introduce either the deposition or the report due to the flaws in Dr. Mittenberg's analysis.

Knight asserts that trial counsel failed to ensure that Knight had the assistance of a competent mental health expert. Consequently, he argues that had the jury been offered mitigating evidence that Knight suffered from a mental health problem, Knight's sentence would have been different. For the reasons below, we conclude that there is competent, substantial evidence to support the postconviction court's finding that Knight failed to show that counsel's performance was deficient and prejudicial.

In Hoskins v. State, 75 So. 3d 250, 255 (Fla. 2011), this Court reiterated the rule that "counsel's entire investigation and presentation will not be rendered deficient simply because a defendant has now found a more favorable expert." Hoskins also failed to show prejudice because "his experts in both the penalty phase and postconviction hearing testified that Hoskins suffered from brain damage. . . . The jury in the penalty phase, however, did not find such evidence sufficient to overcome aggravation in this case." Id. at 255 (quoting Card v. State, 992 So. 2d 810, 818 (Fla. 2008); see also Pham v. State, 177 So. 3d 955, 962 (Fla. 2015) ("As we have repeatedly stated, trial counsel is not deficient simply because postconviction counsel can find a more favorable expert.").

The postconviction court did not err in finding that Knight failed to prove either prong of Strickland. Trial counsel was not deficient, as he provided Knight with a mental health expert, Dr. Mittenberg, and when that expert was unable to

testify, trial counsel sought to find another expert to replicate Dr. Mittenberg's findings. Trial counsel reached out to another doctor, Dr. Arias, to perform the same tests on Knight. Trial counsel testified at the evidentiary hearing that Dr. Arias could not replicate Dr. Mittenberg's results and, in fact, found the opposite. Trial counsel was unable to find another doctor to administer more testing within the two-month period. It is likely that Dr. Arias was unable to replicate Dr. Mittenberg's results because Dr. Mittenberg used an illegal method of scoring Knight's MMPI exam. Furthermore, Knight is unable to show prejudice. Accordingly, we affirm the postconviction court's findings.

Knight's next argument is that trial counsel was deficient because he failed to introduce at trial Dr. Mittenberg's deposition, which would have shown that Knight suffered from a brain abnormality. Trial counsel testified that he did not introduce Dr. Mittenberg's report to the jury because the deposition weakened Dr. Mittenberg's reliability, since he stated in the deposition that he may have a conflict of interest, lied about the reliability of the scoring of Knight's MMPI test, and confessed that he had used an unlicensed scoring system. Additionally, even if counsel was deficient, counsel's actions were not prejudicial. Trial counsel introduced evidence of Knight's brain abnormality through Dr. Kotler's testimony. Even with some evidence of Knight's brain abnormalities, the jury still recommended that Knight be sentenced to death.

Last, Knight argues that trial counsel was deficient because he did not present Dr. Mittenberg's report to the jury. Knight argues that if the jury had heard Dr. Mittenberg's results and opinions, the jury would have recommended a different sentence. At the evidentiary hearing, trial counsel explained that he did not want to introduce Dr. Mittenberg's report because it would have prompted the State to introduce its expert and call into question Dr. Mittenberg's reliability. He further explained that had Dr. Mittenberg been available to testify, he would have called him as a witness, despite the fact that the State would have called its own expert, because trial counsel believed that Dr. Mittenberg's analysis would seem sounder if he were on the stand. Without him, trial counsel felt that using the report would do more harm than good. We conclude that trial counsel employed a reasonable strategy that does not constitute deficient performance under Strickland. Further, Knight was not prejudiced because the jury still heard evidence of Knight's alleged brain abnormality in the form of witness testimony.

### C. Brady Violations

Next, Knight asserts that the State withheld (1) evidence regarding a memorandum by Kevin Noppinger requesting a voluntary demotion, (2) information regarding proof that newspapers existed in the cell area shared by Knight and Steven Whitsett, who testified against Knight; and (3) information

regarding a false confession by Knight to another inmate, George Greaves.  For the reasons below, we conclude that none of Knight's claims require relief.

To successfully raise a <u>Brady</u> violation claim, <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), Knight must show that (1) the evidence was favorable to him, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) the suppression of material evidence resulted in prejudice.  <u>Conahan v. State</u>, 118 So. 3d 718, 729 (Fla. 2013) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).  "To establish the materiality element of <u>Brady</u>, the defendant must demonstrate 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " <u>Id.</u> at 730 (quoting <u>Guzman v. State</u>, 868 So. 2d 498, 506 (Fla. 2003)).  A "reasonable probability" is defined as "sufficient to undermine confidence in the outcome." <u>Johnson v. State</u>, 135 So. 3d 1002, 1028 (Fla. 2014).  This Court reviews a postconviction court's denial of this claim under a mixed standard: we defer to the lower court's factual findings that are supported by competent, substantial evidence and review the application of law de novo.  <u>Id.</u>

### 1.  Noppinger Memorandum

Kevin Noppinger worked at the Broward County Sheriff's Office and conducted the DNA testing in Knight's case.  On July 29, 2002, before he testified at Knight's trial, Noppinger wrote a memorandum to his superior requesting a

voluntary demotion. As the reason for his decision to request a demotion, Noppinger's memorandum cited to conflict with upper management related to his request to improve testing to search the National DNA Index System (NDIS). This memorandum was never discovered by trial counsel or turned over by the State.

Knight argues that this memorandum should have been turned over to the defense because it would have been useful to impeach Noppinger and ultimately would have lessened the confidence the jury had in the DNA testing procedures. Conversely, the State argues that because Knight's case was not an unsolved case requiring use of the NDIS, Noppinger's memorandum was not useful to Knight, let alone prejudicial to the outcome at trial. We affirm the postconviction court's denial of this claim because there is competent, substantial evidence supporting the conclusion that a Brady violation did not occur.

Knight is unable to prove the first prong of Brady. The Noppinger memorandum would not have been useful to Knight because it was unrelated to Knight's case. Although the memorandum was produced prior to Noppinger's testimony at trial, the memorandum cites to management disagreements as the cause for his request to be demoted. Notably, the State points out that Knight's case is not a cold case that requires the use of the national DNA database, and as such, Noppinger's memorandum is entirely unrelated to Knight's case.

Next, Knight has to demonstrate that the postconviction court erred in finding that the State did not willfully or inadvertently withhold evidence. "To comply with Brady, the individual prosecutor has a duty to learn of any favorable evidence and to disclose that evidence to the defense." Mordenti v. State, 894 So. 2d 161, 170 (Fla. 2004) (citing Allen v. State, 854 So. 2d 1255, 1259 (Fla. 2003)). Knight argues that because the crime lab was working on behalf of the State, the prosecutor should have known about the memorandum. Conversely, the State argues that the prosecutor was never made aware of the memorandum. The record is dispositive on this point.

However, even if Knight satisfied prongs one and two of Brady, he is unable to show prejudice. The test for prejudice or materiality under Brady, is whether, had the evidence been disclosed to the defense, there is a reasonable probability of a different result. Guzman, 868 So. 2d at 508. We conclude that there is competent, substantial evidence that the postconviction court did not err in denying relief on this claim. Knight is unable to show how the memorandum specifically reduces the credibility of the State's DNA expert or how that impeachment evidence would have produced a different result. Even if the memorandum had been introduced for the limited purpose of impeaching Noppinger, the State introduced other evidence showing Knight's guilt that would have overcome the little weight the memorandum might have had.

## 2.  Stephen Whitsett

Stephen Whitsett and Knight were housed together from June 29 to July 22, 2000, at the Broward County Jail.  Knight, 76 So. 3d at 883.  Whitsett testified that Knight confessed to murdering the victims.  Knight argues that the State improperly withheld favorable impeachment evidence in the form of a jail log showing that Knight was reprimanded for having newspapers in his cell.  Knight argues that if he had access to the media, so did Whitsett, and the media reports may have tainted his testimony against Knight.  The State argues that the log does not indicate that Whitsett fabricated his testimony because the log showed that Knight had the newspapers in his cell, which he did not share with Whitsett.  Since Knight fails to show that the log was favorable to him, that the State suppressed it, or that suppression prejudiced him at trial, we conclude that a Brady violation did not occur.

## 3.  George Greaves' False Statements

After Knight's trial, Knight made a supplemental request for a police report made by Detective Doug Williams.  Knight's request was granted, and the Coral Springs Police Department turned over the report of Detective Williams' interview of George Greaves, an inmate at Broward County Jail who contacted crime stoppers stating that he had information regarding Knight's case.  Ultimately, it became apparent that Greaves was gleaning information from media reports.

Knight asserts that the State's withholding of the report was a <u>Brady</u> violation, and he should have been granted a new trial. Knight argues that if defense counsel had known about the false statements made on the basis of accessible media reports, counsel could have discredited Whitsett's testimony. After the evidentiary hearing, the postconviction court found that Knight failed to meet the <u>Brady</u> standards. We conclude that there is competent, substantial evidence that the postconviction court did not err in its findings.

Knight asserts that the police report would have been favorable to him because it would have helped to discredit Whitsett's testimony against Knight. However, Knight fails to show how the fact that Greaves had access to media reports that led to false statements would have discredited the detail-intensive testimony that Whitsett provided. Further, from the record it is unclear whether the prosecutor knew or should have known that the police report existed, and Knight fails to discuss this point.

Moreover, Knight is unable to show prejudice because the State introduced other evidence of Knight's guilt, including the victim's blood on the clothes Knight was wearing the night of the crime and that Knight was in the apartment that evening.

## D. Constitutionality of Rule Regulating the Florida Bar 4-3.5(d)(4)

Knight challenges the constitutionality of rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar. We reject this claim because it is procedurally barred.

The Court has held that claims challenging the constitutionality of rule 4-3.5(d)(4) must be raised on direct appeal. See Deparvine v. State, 146 So. 3d 1071, 1106 (Fla. 2014) ("Deparvine's claim is both procedurally barred because it was not raised on direct appeal and meritless."); Troy v. State, 57 So. 3d 828, 841 (Fla. 2011) ("First, this claim is procedurally barred because it should have been raised on direct appeal.").

### E. Constitutionality of Lethal Injection Protocol

Knight argues that Florida's administration of the death penalty by lethal injection constitutes cruel and unusual punishment, in violation of the Eight Amendment. We conclude that Knight's claim is unsuccessful because this Court has repeatedly denied such claims. See, e.g., Banks v. State, 150 So. 3d 797, 800-01 (Fla. 2014); Chavez v. State, 132 So. 3d 826, 831 (Fla. 2014).

### III. HABEAS CORPUS CLAIMS

### A. Ineffective Assistance of Counsel

Claims of ineffective assistance of appellate counsel are appropriately raised in a petition of writ of habeas corpus. See Jackson v. State, 127 So. 3d 447, 476 (Fla. 2013). This Court has stated the following standard of review:

> The alleged error must first be of "such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the

range of professionally acceptable performance" and, second, the deficiency in performance must have "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Id. (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)). Further, "appellate counsel will not be deemed ineffective for failing to raise a claim that is without merit." Id. (citing Freeman v. State, 761 So. 2d 1055, 1070 (Fla. 2000)).

Hayward v. State, 183 So. 3d 286, 327 (Fla. 2015).

### 1. Admission of Photograph at Trial

At trial, Knight's trial counsel challenged the admission of a photograph as duplicative of other photographs depicting similar images. We have held that a challenge to a photograph is not preserved for appeal when trial counsel does not state specific grounds for an objection. In Doorbal v. State, 983 So. 2d 464 (Fla. 2008), we concluded that trial counsel did not properly preserve a similar issue for appeal because trial counsel objected to the admission of a picture on the basis that it was "duplicative." Id. at 498-99. We stated that trial counsel failed to preserve the issue because trial counsel did not challenge the photograph for being "gruesome," as he did in his postconviction case. Id. at 499. Similarly, Knight's trial counsel did not preserve the issue for appeal. As such, Knight's appellate counsel was not ineffective for failing to present a claim that was not properly preserved.

### 2. Denial of Motion for Mistrial

- 30 -

Knight argues that appellate counsel was ineffective for failing to appeal the trial court's denial of a mistrial following Officer Mocny's testimony concerning Knight's prearrest statements. When reviewing claims of ineffective assistance of appellate counsel,

> "[t]he criteria for proving ineffective assistance of appellate counsel parallel the Strickland standard for ineffective trial counsel." Wilson v. Wainwright, 474 So. 2d 1162, 1163 (Fla. 1985). Thus, the Court must consider
>
>> first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
>
> Teffeteller v. Dugger, 734 So. 2d 1009, 1027 (Fla. 1999) (quoting Suarez v. Dugger, 527 So. 2d 190, 192-93 (Fla. 1988)).

Mungin, 932 So. 2d at 1003.

Knight asserts that Officer Mocny testified on the topic of Knight's right to remain silent, thus violating Knight's constitutional rights. We reject Knight's argument because Officer Mocny's testimony of her conversation with Knight did not violate Knight's constitutional rights. Accordingly, appellate counsel was not ineffective for raising a meritless claim.

This Court has repeatedly recognized the concept that courts must prohibit all evidence or argument that may be interpreted by the jury as a comment on the

defendant's right to remain silent.  Brown v. State, 197 So. 3d 569 (Fla. 3d DCA

2015) (citing State v. Smith, 573 So. 2d 306 (Fla. 1990)).

> Based on its interpretation of article I, section 9 of the Florida
> Constitution, the court in Hoggins held that a prosecutor may not
> comment upon or attempt to impeach a defendant with his or her post-
> arrest, pre-Miranda[2] or post-Miranda silence.  This prohibition is
> premised upon the generally accepted principle that a defendant does
> not waive his or her right to remain silent at the time of arrest by
> testifying in his or her own defense at trial.  The same test applies
> regardless of whether the evidence of post-arrest silence is admitted in
> the state's case in chief or during impeachment of the defendant: "If
> the comment is fairly susceptible of being construed by the jury as a
> comment on the defendant's exercise of his or her right to remain
> silent, it violates the defendant's right to silence."  Hoggins, 718 So.
> 2d at 769.

Robbins v. State, 891 So. 2d 1102, 1106 (Fla. 5th DCA 2004); see also Chamblin

v. State, 994 So. 2d 1165, 1168 (Fla. 1st DCA 2008) (concluding that "[t]he

Florida Constitution prohibits prosecutorial comment on a defendant's silence at

the time of his arrest, prior to the administration of his Miranda warnings, as well

as attempts to impeach the defendant therewith.").

The record shows that Mocny's testimony referenced Knight's statements

before he was arrested regarding his whereabouts on the night of the crime and

whether he had a key to Stephens' apartment.  Mocny's testimony did not

---

2.  Miranda v. Arizona, 384 U.S. 4336 (1966).

- 32 -

comment on Knight's silence.  Because this claim would have been meritless on direct appeal, we conclude that Knight's appellate counsel was not ineffective.

### 3.  Hurst v. Florida

In two rounds of supplemental briefs, Knight argues that he was unconstitutionally sentenced to death because his penalty phase jury did not find all of the facts necessary to impose the death penalty.  We agree.  See Hurst v. Florida, 136 S. Ct. 616, 624 (2016).  Because Knight's death sentence became final in 2012, Hurst v. Florida applies retroactively to him.  See Mosley v. State, No. SC14-436, 2016 WL 7406506, at *25 (Fla. Dec. 22, 2016).

Knight also asks that we vacate his death sentence and sentence him to life imprisonment pursuant to section 775.082(2), Florida Statutes, or alternatively, that we remand for a new penalty phase proceeding.  We decline to do either.  First, we recently held that section 775.082(2), Florida Statutes, does not mandate the imposition of a life sentence in the event of a Hurst v. Florida violation.  See Hurst v. State, 202 So. 3d 40, 63-66 (Fla. 2016).  We also decline to vacate Knight's death sentence because we find that this is one of the rare cases in which the Hurst v. Florida violation is harmless beyond a reasonable doubt.  See Davis v. State, 41 Fla. L. Weekly S528, S539-40 (Fla. Nov. 18, 2016).

In Davis, this Court held that the Hurst v. Florida error was harmless: "With regard to Davis's sentences, we emphasize the unanimous jury recommendations

of death. These recommendations allow us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." Id. at S539 (emphasis omitted). Knight's jury likewise recommended a death sentence by a unanimous twelve-to-zero vote. Knight's jury received substantially the same standard jury instruction as we cited in Davis, ensuring that the jury "determine[d] whether sufficient aggravators existed and whether the aggravation outweighed the mitigation before it . . . recommend[ed] a sentence of death." Id. (citing Fla. Std. Jury Instr. (Crim.) 7.11). As with the jury in Davis, Knight's "jury was presented with evidence of mitigating circumstances and was properly informed that it may consider mitigating circumstances that are proven by the greater weight of the evidence." Id. (citing Fla. Std. Jury Instr. (Crim.) 7.11). As in Davis, Knight's "jury was not informed that the finding that sufficient aggravating circumstances outweighed the mitigating circumstances must be unanimous, and . . . the jury did, in fact, unanimously recommend death." Id. (citing Fla. Std. Jury Instr. (Crim.) 7.11).

To be sure, Knight's jury and the Davis jury were not identically instructed. For instance, the Davis jury "was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators," while Knight's jury was not. Id. (citing Fla. Std. Jury Instr. (Crim.) 7.11). Nonetheless, we believe that Knight's jury received substantially the same critical instructions as Davis's jury,

- 34 -

allowing us to conclude beyond a reasonable doubt that here, as in <u>Davis</u>, "the jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendations." <u>Id.</u>

Finally, as in <u>Davis</u>, "the egregious facts of this case" provide "[f]urther support[] [for] our conclusion that any <u>Hurst v. Florida</u> error here was harmless." <u>Id.</u> at 539-40. In a violent and bloody struggle, Knight murdered a mother and her four-year-old daughter in an argument about whether Knight had to move out of the mother's apartment. Knight strangled and repeatedly stabbed the mother with multiple knives in her bedroom in the middle of the night while the daughter was present. The mother could not yell for help because Knight's attack had destroyed her larynx. The mother suffered, still conscious, through the attack for at least ten minutes following the fatal wounds. She tried and failed to escape. Knight also attempted to strangle and repeatedly stabbed the daughter. Knight's stabbings caused the daughter's lungs to fill with blood, and she essentially drowned in her own blood. Both victims died gruesome, painful deaths.

> The trial court found two statutory aggravating circumstances for the murder of [the mother]: (1) a previous conviction of another violent capital felony, and (2) HAC. The court also found three statutory aggravating circumstances for the murder of [the daughter]: (1) a previous conviction of another violent capital felony, (2) HAC, and (3) the victim was under twelve years of age.

<u>Knight</u>, 76 So. 3d at 890. As we have repeatedly noted, "[t]he HAC and prior violent felony aggravators have been described as especially weighty or serious

- 35 -

aggravators set out in the sentencing scheme." Hildwin v. State, 84 So. 3d 180, 190 (Fla. 2011).

What we said in Davis is equally true here:

Here, the jury unanimously found all of the necessary facts for the imposition of death sentences by virtue of its unanimous recommendations. In fact, although the jury was informed that it was not required to recommend death unanimously, and despite the mitigation presented, the jury still unanimously recommended that [the defendant] be sentenced to death . . . . The unanimous recommendations here are precisely what we determined in Hurst[v. State] to be constitutionally necessary to impose a sentence of death.

Davis, 41 Fla. L. Weekly at S540. Accordingly, we hold that the Hurst v. Florida violation in Knight's case was harmless beyond a reasonable doubt. See id. As in Davis, the Hurst v. Florida violation here does not entitle Knight to a new penalty phase.

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's denial of postconviction relief. We also deny Knight's petition for a writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
CANADY and POLSTON, JJ., concur in result.
QUINCE, J., concurs in part and dissents in part with an opinion, in which PERRY, Senior Justice, concurs.
PERRY, Senior Justice, concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

QUINCE, J., concurring in part and dissenting in part.

I concur with my colleagues that Knight is not entitled to relief on the majority of his claims, however, I cannot agree with the majority's conclusion that the Hurst error in this case is harmless beyond a reasonable doubt. Because I would find that the Hurst error in this case requires a new penalty phase, I dissent.

I agree with Senior Justice Perry's statement that "[t]he majority's reweighing of the evidence . . . to support its conclusion" contravenes our decision in Hurst v. State, 202 So. 3d at 49, and is the conduct the United States Supreme Court reproached in Hurst v. Florida, 136 S. Ct. at 622.

Here, although the jury unanimously recommended a death sentence, we cannot know that the jury found each aggravating factor unanimously. Because one of the aggravators found by the trial court for each murder in this case—that the murder was especially heinous, atrocious or cruel—requires specific factual findings, Hurst requires that the jury, not the trial judge, make that determination. The jury made no such determination in Knight's case. Accordingly, I would vacate Knight's death sentence and remand for resentencing. See Hurst, 202 So. 3d at 69.

PERRY, Senior Justice, concurs.

PERRY, Senior Justice, concurring in part and dissenting in part.

While I concur in most respects with the majority's decision, I cannot agree with the majority's analysis that the Hurst v. Florida, 136 S. Ct. 616 (2016), error was harmless beyond a reasonable doubt. To the extent that I would not find the error harmless beyond a reasonable doubt, I dissent. I likewise dissent from the majority's determination that section 775.082(2), Florida Statutes, is inapplicable to this case: I would follow the Legislature's command to impose a sentence of life imprisonment.

In Hurst v. State, 202 So. 3d 40, 69 (Fla. 2016), we declined to speculate why the jurors voted the way they did; yet, here, the majority "conclude[s] beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." Majority op. at 33 (quoting Davis v. State, 41 Fla. L. Weekly S528, S539 (Fla. Nov. 18, 2016). Even though the jury unanimously recommended the death penalty, whether the jury unanimously found each aggravating factor remains unknown.

The majority's reweighing of the evidence—particularly the gruesome facts of the victims' deaths—to support its conclusion is not an appropriate harmless error review. The harmless error review is not a sufficiency of the evidence test, and the majority's analysis should instead focus on the effect of the error on the trier of fact. State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). By ignoring the record and concluding that all aggravators were unanimously found by the jury, the

majority is engaging in the exact type of conduct the United States Supreme Court cautioned against.  See Hurst v. Florida, 136 S. Ct. at 622.

Because the harmless error review is neither a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," DiGuilio, 491 So. 2d at 1139, I cannot conclude beyond a reasonable doubt that the error here was harmless, and I would vacate Knight's unconstitutional death sentence.  Rather than remand for resentencing, however, I would apply the remedy that the Legislature explicitly provided: a sentence of life imprisonment.  See § 775.082(2), Fla. Stat. (2016).

As I have previously explained, the Legislature has decided that the appropriate remedy "[i]n the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court" is for "the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment."  § 775.082(2), Fla. Stat.; see also Hurst v. State, 202 So. 3d at 75-76 (Perry, J., concurring in part and dissenting in part).  The death penalty in Knight's capital felony has been held unconstitutional by this Court.  See majority op. at 32.  Accordingly, Knight is entitled to the clear and unambiguous statutory remedy that the Legislature has specified: a sentence of life imprisonment.

The majority disagrees.  See majority op. at 33 (citing Hurst v. State, 202 So. 3d at 63-66).  But the plain language of the statute does not rely on a specific amendment to the United States Constitution, nor does it refer to a specific decision by this Court or the United States Supreme Court.  Further, it does not contemplate that all forms of the death penalty in all cases must be found unconstitutional.  Instead, the statute uses singular articles to describe the circumstances by which the statute is to be triggered.  Indeed, the statute repeatedly references a singular defendant being brought before a court for sentencing to life imprisonment.  I consequently cannot agree that the statute was intended as a fail-safe mechanism for when this Court or the United States Supreme Court declared that the death penalty was categorically unconstitutional.  Cf. Hurst v. State, 202 So. 3d at 66.

Knight's death sentence is unconstitutional.  That constitutional violation is not harmless beyond a reasonable doubt.  The remedy for that violation is a sentence of life imprisonment.  To the extent that the majority finds harmless error and declines to order a sentence of life imprisonment, I respectfully dissent.

Two Cases:

An Appeal from the Circuit Court in and for Broward County,
     Eileen M. O'Connor, Judge - Case No. 062001CF014055A88810
And an Original Proceeding – Habeas Corpus

- 40 -

Neal Andre Dupree, Capital Collateral Regional Counsel, Southern Region, Todd Gerald Scher, Assistant Capital Collateral Regional Counsel, Southern Region, and Jessica Leigh Houston, Staff Attorney, Fort Lauderdale, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Lisa-Marie Krause Lerner, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee/Respondent